UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

JACKLYN ANN SANCHEZ,                                    CV 09-109-KI

                Plaintiff,                       OPINION AND ORDER

    v.

MICHAEL J. ASTRUE, Commissioner of
Social Security,

                Defendant.

_____

KING, Judge:

      Plaintiff Jacklyn Ann Sanchez seeks judicial review of a final decision of the

Commissioner of Social Security ("Commissioner") denying her claim for Supplemental Security

Income ("SSI") payments under Title XVI of the Social Security Act, 42 U.S.C. § 1383(c)(3) et

PAGE 1 - OPINION AND ORDER

seq. The issue is whether the Commissioner's decision is supported by substantial evidence in the record, and free of legal error. This court has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). For the reasons set forth below, I AFFIRM the Commissioner's decision.

## I. Procedural Background

On July 30, 2003, Plaintiff protectively filed an application for SSI payments, alleging disability beginning August 1, 2002, due to back and neck pain, depression, carpal tunnel syndrome, mild lupus with fibromyalgia, anxiety, and headaches. Tr. 20, 97.[1] That claim was denied initially on March 4, 2004, and upon reconsideration on May 20, 2004. Tr. 20, 78-79, 83-86. Plaintiff timely filed a written request for a hearing on July 9, 2004. Tr. 20, 76.

On April 9, 2007, Plaintiff appeared and testified at a hearing before Administrative Law Judge ("ALJ") Charles S. Evans. Tr. 20, 548-59. A vocational expert, Gail E. Young, and a medical expert, David Rullman, M.D., also testified at the hearing. Tr. 20, 559-65.

On May 7, 2007, ALJ Evans issued a decision concluding that Plaintiff was not disabled and retained the Residual Functional Capacity ("RFC") to perform past relevant work. Tr. 20-30. Accordingly, the ALJ denied Plaintiff's July 30, 2003 application for SSI payments. Tr. 30.[2] The ALJ's decision became the Commissioner's final decision when the Appeals Council denied Plaintiff's request for review on November 25, 2008. Tr. 5; 20 C.F.R. §§ 404.981, 416.1481; Russell v. Bowen, 856 F.2d 81, 83-84 (9th Cir. 1988).

---

[1]"Tr." refers to the certified copy of the Transcript of Administrative Record submitted by Defendant on July 8, 2009, pursuant to 42 U.S.C. § 405(g).

[2]The ALJ's May 7, 2007 decision addresses only Plaintiff's July 30, 2003 application for SSI payments. The ALJ did not consider, or make findings, regarding Plaintiff's May 22, 2006 application for disability insurance benefits because the Social Security Administration was still processing that application at the time of the April 9, 2007 hearing. Tr. 20.

## II. Factual Background

*A. Plaintiff's History*

Plaintiff was born in 1960.  Tr. 97.  At the time of the hearing before the ALJ on April 9,

2007, she was 46 years old.  She is five feet, 6 inches tall, and weighs 190 pounds.  Tr. 118.  Her

past relevant work experience includes receptionist, cashier, restaurant hostess, data entry, home

maker, and cook/baker.  Tr. 29, 120, 131.  Plaintiff claims that she began having lower back pain,

tingling in her hands and feet, headaches, and depression in November 1999.  Tr. 119.  She

stopped working on June 15, 2002, due to pain in her back and legs, and headaches.  Tr.119.  She

alleges that she has been disabled since August 1, 2002, due to back and neck pain, depression,

carpal tunnel syndrome, mild lupus with fibromyalgia, anxiety, and headaches. Tr. 97.

*B. Medical Record*

On November 21, 2002, Plaintiff had x-rays of the lumbar spine, which were normal.

Tr. 260.  Plaintiff's January 7, 2003 x-rays of the cervical-spine, right wrist, and right elbow were

also normal.  Tr. 257-59.

January 25, 2003, Plaintiff was examined at University Medical Center, and reported a

history of headaches, numbness and tingling in her right hand, and left hip and lower back pain.

Tr. 248.  An exam of the right hand showed positive Tinel's sign and Phalen's test, and a mildly

positive Finkelstein's test.  Tr. 249.  Otherwise, motor function, strength, grip strength, and range

of motion were normal.  Tr. 249.  Dr. David Crutchfield, M.D., diagnosed migraine headaches

and right carpal tunnel syndrome, and recommended following up with primary care provider

and neurology consultation.  Tr. 249.  A computerized topography ("CT") scan of the brain on

the same date was normal.  Tr. 250.

A January 27, 2003 magnetic resonance imaging ("MRI") of the lumbar spine revealed mild changes of osteoarthritis L4-L5 and L5-S1 facet joints, ligamentum flavum hypertrophy without significant canal stenosis, and no disc pathology identified. Tr. 255. Plaintiff's February 8, 2003 x-rays of the lumbar spine were normal. Tr. 254. Radiologist Brent Birkin, M.D., noted normal vertebral alignment and well maintained spaces throughout, no significant degenerative lesions, no evidence of bony injury, and normal soft tissue structures. Tr. 254.

On March 11, 2003, Plaintiff was seen at the Las Vegas Pain Institute because of severe pain, starting in the lower back and going down the left lower extremity. Tr. 182. Dr. Godwin Maduka, M.D., noted Plaintiff's normal x-ray of the lumbar spine, but also pointed out that Plaintiff had an MRI of the lumbar spine that showed osteoarthritis at L4-5 and L5-S1 in the facets and ligamentum flavum hypertrophy. Tr. 182. On examination, Dr. Maduka noted tenderness in Plaintiff's neck from C4 to C7-T1, and tenderness in Plaintiff's back over L4-5 and L5-S1. Tr. 182. There was no sensory or motor deficit in the upper or lower extremities. Tr. 182. Dr. Maduka recommended that Plaintiff undergo cervical and lumbar epidural injections, as well as lumbar facet joint injections. Tr. 183.

Plaintiff reported that she had a motor vehicle accident on March 13, 2003, and complained of neck and shoulder pain, tingling and numbness in both arms, low back pain and numbness in left leg, and headaches. Tr. 181. Dr. Maduka thought Plaintiff would benefit from additional cervical, thoracic, and lumbar epidural injections. Tr. 181.

Plaintiff had x-rays of the thoracic, cervical, and lumbar spine on March 25, 2003. Thoracic spine x-rays showed mild degenerative disc disease. Tr. 187. Cervical spine x-rays showed slight straitening of the cervical curvature, but otherwise an unremarkable examination.

PAGE 4 - OPINION AND ORDER

Tr. 186.  The lumbar spine x-ray revealed no evidence of acute traumatic injury or significant degenerative disc disease.  Tr. 185.

On April 9, 2003 Plaintiff's chiropractor, Corey Wachs, diagnosed acute sprain/strain of the cervical, thoracic, and lumbar para vertebral soft tissue structures with associated subluxations, as well as cervicalgia, cervicogenic headaches, acute hyper flexion/extension injury of the cervical spine, cervical nerve root irritation, and lumbar nerve root irritation.  Tr. 285.  He recommended Plaintiff refrain from lifting more than 10 pounds, and begin soft tissue manipulation, osseous manipulation, hydroculation and ultrasound treatment, spinal traction, and application of ice.  Tr. 286.

Plaintiff returned to the Las Vegas Pain for several follow up examinations with Dr. Maduka.  On May 16, 2003, Dr. Maduka noted that the CT of the brain was unremarkable.  Tr. 174.  A radiologist, Patrick Boland, D.O., concurred with Dr. Maduka's impression of an "unremarkable CT of the brain."  Tr. 184.  Dr. Maduka again noted Plaintiff's lumbar facet osteoarthritis, and prescribed Percocet and Soma.  Tr. 174.  On May 23, 2003, Plaintiff reported severe pain, but  Dr. Maduka noted that there was no other change in the physical examination except for tenderness to palpation over L4-5 and L5-S1.  Tr. 172.  Dr. Maduka suggested that Plaintiff's osteoarthritis may have been exacerbated by her motor vehicle accident.  Tr. 172.  On May 30, 2003, Plaintiff reported continued pain.  Dr. Maduka prescribed a narcotic pain medication and a sleep aid, and recommended additional epidural injections.  Tr. 171.

On June 5, 2003, Dr. Jaswinder S. Grover, M.D, examined Plaintiff.  He noted tenderness in the paracervical and paralumbar area, and that Spurling's sign was equivocal in the bilateral upper extremities.  Tr. 297.  Dr. Grover also noted some element of stenosis and disc protrusion

at L4-5 and L5-S1 on Plaintiff's March 2003 MRI. Tr. 298.  His impression was mechanical low back pain and lower extremity radiculopathy and cervical sprain/strain with interscapular and upper extremity radiculopathy.  Tr. 298.

On June 20, 2003, Plaintiff had an MRI of the cervical spine, which was normal.  Tr. 301. That same day, Plaintiff had a CT scan of the lumbar spine, which revealed possible mid-sized central and left paracentral disc extrusion at L5-S1.  Tr. 302.  Dr. Danny Eisenberg, M.D., expressed concern that the visualization by CT was not optimal.  If this is a true lesion, he concluded, it causes minimal impingement and questionable minimal narrowing of the left root canal.  Tr. 302.

On August 28, 2003, Plaintiff reported that she had been involved in another motor vehicle accident, and complained of posterior neck, lower back, and hip pain following the accident.  Tr. 234.  X-rays of the thoracic spine and pelvis were normal.  Tr. 234.  Radiologist Carl Recine, M.D., noted that the cervical-spinal x-ray revealed normal vertebral alignment, no significant degenerative lesions, and no evidence of bony injury.  Tr. 236.  The pelvis x-ray showed no evidence of fracture, dislocation, or other bone or joint abnormality.  Tr. 237.  Dr. William Z. Harrington, M.D., examined Plaintiff and found that she had full range of motion in her extremities without tenderness, and that her neurological and psychiatric evaluations were unremarkable.  Tr. 234.  Dr. Harrington noted tenderness and contusions present around the hip. Tr. 234.

Dr. Kenneth Grant, M.D., a rheumatologist, examined Plaintiff on August 6, 2003.  Tr. 264-68.  He reported multiple fibromyalgic trigger points in the neck, upper back, low back, anterior chest, arms, and lower extremities were about 2+ tight and tender.  Tr. 265, 267.  He also

PAGE 6 - OPINION AND ORDER

noted positive Tinsel's sign on both sides, but good pinch grip bilaterally.  Tr. 267.  Dr. Grant's

impression included lupus, fibromyalgia, carpal tunnel syndrome bilaterally, and traumatic

myofasciitis.  Tr. 265, 267.   Dr. Grant recommended a more traditional physical therapy with

heat and ultrasound, prescribed a sleep aid, and ordered a comprehensive lab panel. Tr. 268.

On September 3, 2003, Plaintiff's chiropractor, Dr. Wachs, reiterated his previous

diagnoses, and included TMJ sydrome and lumbago.  Tr. 275.   He repeated his previous

instructions to avoid lifting more than 10 pounds, and recommended continuation of the same

treatment (*e.g.*, soft tissue manipulation, osseous manipulation, spinal traction, etc.).  Tr. 275-76.

Dr. Grover examined Plaintiff on November 6, 2003.  Tr. 292-94.  He again noted

tenderness of the paracervical and paralumbar area, and slight weakness in the left arm and left

leg. Tr. 293.  Spurling sign was positive on the left.  Tr. 293.  Dr. Grover examined x-rays of

Plaintiff's cervical and lumbar spine, and found them focally unremarkable.  Tr. 293.

On December 10, 2003, Plaintiff had an MRI of the lumbar spine, which revealed "very

early degenerative changes at L4-5 and minimal foraminal stenosis at L4-5 on the left.  Mild to

moderate-sized disc extrusion at L5-S1, left paracentrally, possibly affecting the left S1 nerve

root." Tr. 299.  That same date, Plaintiff had an MRI of the cervical spine, which revealed

minimal central stenosis at C3-4, C4-5, and C5-6.  Tr. 300.  Dr. Eisenberg thought these findings

were of questionable acute significance because it was probably secondary to a congenitally,

minimally narrowed bony canal.  Tr. 300.  The MRI was otherwise unremarkable.  Tr. 300.

Joe Wood, Psy. D., conducted a psychodiagnostic evaluation of Plaintiff on February 16,

2004.  Tr. 303.  He noted that Plaintiff made good eye contact, and that she was cooperative,

pleasant, and clam.  Tr. 304.  Dr. Wood described Plaintiff as above-average height, but obese.

PAGE 7 - OPINION AND ORDER

Tr. 304.  Although she reported being depressed, she talked energetically at times, demonstrated

a range of affect, and her rate of speech was unremarkable.  Tr. 304.  Dr. Wood felt that

Plaintiff's complaints of depression were exaggerated, and inconsistent with her energetic

presentation and her reported level of functioning.  Tr. 305-06.  He made no mental diagnoses.

Tr. 306.

On March 2, 2004, Martin Kehrli, M.D., a non-examining medical source completed an

assessment of Plaintiff's physical RFC.  Tr. 308-12.  He found Plaintiff would be limited to

medium exertion work, with the ability to occasionally lift 50 pounds, frequently lift 25 pounds,

stand or walk about 6 hours in an 8-hour workday, and sit for about 6 in an 8-hour work day.  Tr.

309.  He noted that Plaintiff was unlimited in her ability to push or pull.  Tr. 309.  Dr. Kehrli also

noted that Plaintiff was able to climb stairs, balance, and kneel frequently.  Tr. 310.  She is

limited to only occasional climbing of ladders, stooping, crouching, or crawling.  Tr. 310.  Dr.

Kehrli found that Plaintiff had limited ability to reach in all directions (including overhead), but

that she had no manipulative limitations in handling, fingering, or feeling.  Tr. 310.  Another

non-examining medical source, Linda Jensen, M.D., found that Plaintiff should be limited to

light exertion work.  Tr. 312.

On May 18, 2004, Dr. Robert Henry, Ph.D., conducted a psychological evaluation and

found no medically determinable psychological impairment.  Tr. 314.

Between August 2004, and November 2006, Plaintiff visited emergency rooms on

numerous occasions.  Plaintiff was transported the emergency room via ambulance on August 11,

2004, for a possible overdose.  Tr. 441.  An intake staff person reported that Plaintiff was obese.

Tr. 443.  Plaintiff reported consuming Klonopin, Percocet, Prozac, and alcohol.  Tr. 441.  She

PAGE 8 - OPINION AND ORDER

denied attempting suicide, explaining that she was trying to relieve pain.  Plaintiff was evaluated

by a mental health social worker, but acute psychiatric hospitalization was not required.  Dr.

Daniel Douglas, M.D., recommended Plaintiff follow up with her therapist.  Tr. 442.

On August 26, 2004, Plaintiff visited the emergency room because of an exacerbation of

chronic intermittent back pain and insomnia.  Tr. 435.  Dr. C. Stephen White, M.D., noted this

was Plaintiff's "typical pain, severe in the low back radiating down the leg."  Tr. 435.  He also

noted that Plaintiff "freely admits to a large amount of narcotic use in the past."  Tr. 435.  Dr.

White noted "quite a bit of pain in the lumbar region which limits her activity with limited range

of motion."  Tr. 435.  Dr. White opined that the emergency room should not prescribe outpatient

narcotics due to her significant psychosocial history of narcotic use.  Tr. 435. He diagnosed back

pain, and recommended Plaintiff follow up with her primary care physician.  Tr. 436.

On September 30, 2004, paramedics took Plaintiff to the emergency room after an

apparent overdose.  Tr. 425.  She stated that she had consumed Tylenol PM, Geodon, nine

Klonopin tablets, and alcohol.  Plaintiff reported depression, but denied suicidal ideation.  Tr.

425, 427.  The attending physician recommended a social work follow up.  Tr. 426.

On June 20, 2005 Plaintiff visited the emergency room because of headache.  Tr. 418.

Dr. David Pruett, M.D., noted that Plaintiff appeared comfortable and moved her extremities

spontaneously.  Tr. 419.  He did not believe the headaches warranted neurologic imaging and

treated Plaintiff with various pain medications and muscle relaxants.  Tr. 419.  On July 11, 2005,

Plaintiff visited the emergency room with "diffuse low back pain that radiates down the back of

her legs bilaterally," and headaches.  Tr. 412.  Dr. T. Max Reitz, M.D., noted probable

musculoskeletal back pain and tension headaches.  Tr. 413.  He prescribed small amount of

narcotic medication, and recommended Plaintiff follow up with her primary care physician.  Tr.

413.  Dr. Reitz also noted that after she was discharged, Plaintiff was "seen to pick up a chair and

move it into the room of a companion . . . without any evidence of back pain or discomfort at

all."  Tr. 413.   On July 15, 2005, Plaintiff visited the emergency room with lower back pain and

radiating pain down both legs.  Tr. 406.  She requested a "back injection," and pain medicine.

Tr. 406.  Dr. C. Stephen White, M.D., treated her with a shot of Demerol.  Tr. 407.  Although he

also prescribed Vicodin and Flexeril, Dr. White noted that Plaintiff should talk to her primary

care physician and develop a plan of treatment before the emergency department prescribed

further narcotics.  Tr. 407.

On August 11, 2005, Plaintiff visited the emergency room for low back pain.  Tr. 399.

Dr. Charles Hartness, M.D., noted Plaintiff's history of recurrent problems with back pain, but

noticed no obvious injury to the area.  Tr. 399.  Dr. Hartness did not believe any imaging studies

or specific lab testing were needed, but administered Morphine and prescribed Percocet.  Tr. 399-

400.  On August 20, 2005, Plaintiff again visited the emergency room complaining of back pain.

Tr. 393.  Dr. C. Stephen White, M.D., noted that this was Plaintiff's fifth visit to the emergency

room in the last month for pain, and that narcotic pain medication had been prescribed each time.

Tr. 393.  Dr. White opined that "it is problematic for the emergency room to prescribe narcotics,"

and that "we may be dealing with drug seeking behavior."  Tr. 393.  He prescribed a non-narcotic

pain medication, and noted that any "further narcotics should come from her pain doctor or from

her primary car physician," not the emergency room.  Tr. 294.

On September 2, 2005, Plaintiff was again taken to the emergency room due to an

overdose of Elavil, Ativan, Tylenol, Vicodin, Prozac, and alcohol.  Tr. 379.  Plaintiff denied any

suicidal ideation, and reported that she just wanted to get some sleep.  Tr. 379.  The attending

physician saw no evidence of acute abnormality and released Plaintiff after several hours of

observation. Tr. 380.  Dr. Julie Andrews, M.D., recommended that Plaintiff follow up with a

psychiatrist.  Tr. 380.

On September 8, 2005, Plaintiff underwent a Medication Consultation at Lifeworks

Northwest.  Tr.496-99.  Dr. Howard Rosenbaum, M.D., noted Plaintiff's history of recrrent

depression and anxiety.  Tr. 496.  Plaintiff reported that the current depressive episode had gone

on for years.  Tr. 499.  Her symptoms included depression, decreased sleep, decreased appetite,

loss of energy, irritability, and tearfulness.  Tr. 496.  Plaintiff denied suicidal ideation.  Tr. 496.

On September 16, 2006, Plaintiff visited the emergency room complaining of low back

pain and requesting pain medicine.  Tr. 374.  Dr. Kenneth Bizovi, M.D., examined Plaintiff as

did not see any need for diagnostic work up.  Tr. 375.  He noted that Plaintiff "should not get any

more opiate pain medication in the emergency department."  Tr. 374.  He also noted that "Dr.

White documents that she has failed to follow up at times in the past and that she was told that

she was not going to get any more opiate medications hear." Tr. 374.

Plaintiff allegedly fell on November 7, 2006, and visited the emergency room

complaining of back pain.  Tr. 358.  Dr. Thomas Calverley, M.D., examined Plaintiff and noted

pain to palpation in para-thoracic and para-lumbar spine, as well as generalized pain to palpation

with range of motion of left shoulder.  Tr. 359.  Plaintiff stated that she needed narcotic pain

pills.  Tr. 358.  Dr. Calverley expressed concern about drug seeking behavior, and noted that he

did "not feel it is appropriate fro use to be writing her for further narcotic pain pills, especially

given the vagueness of her symptomatology." Tr. 359.  The doctor prescribed Plaintiff a non-

PAGE 11 - OPINION AND ORDER

narcotic pain reliever and recommended she follow up with her primary care provider.  Tr. 359.

On November 24, 2006, Plaintiff visited the emergency room, complaining of insomnia and chronic pain.  Tr. 344, 351.  She stated that she has had trouble sleeping since she stopped taking methadone, and that Ambien has worked in the past.  Tr. 351.  Dr. Kenneth Bizovi, M.D., noted she was awake, alert, and interacting appropriately, but tearful.  Tr. 351.  Dr. Bizovi's impression was insomnia and chronic pain.  Tr. 351.  He prescribed Ambien and discharged her. Tr. 351.  The next day, November 25, 2006, Plaintiff again visited the emergency room complaining of insomnia.  Tr. 344.  She stated that the prescribed Ambien was not helpful in giving her sleep, and that she went dancing the night before and was still unable to sleep.  Tr. 344.  Dr. Thomas Calverley, M.D., noted no evidence of organic pathology except for Plaintiff's nonspecific insomnia, which may have been related to methadone withdrawal.  Tr. 345.  He also state that ongoing benzodiazepines were not appropriate through the emergency department given Plaintiff's history.  Tr. 345.

The next night, November 26, 2006, Plaintiff was arrested for driving under the influence of intoxicants.  Tr. 332.  Police took her to jail, but later transported to the emergency room because she was unresponsive.  Dr. Julie Andrews, M.D., felt that Plaintiff's symptoms were consistent with alcohol intoxication, but also noted possible narcotic overdose in light of her history of drug abuse.  Tr. 333.  A CT scan of her head was normal.  Tr. 333, 451.  Dr. Andrews offered to refer Plaintiff to a social worker for drug and alcohol treatment, but Plaintiff refused therapy.  Tr. 333.

On December 11, 2006, Plaintiff underwent a mental status exam at Lifeworks Northwest.  Tr. 508.  Dr. Jonathan Betlinski, M.D., diagnosed a recurrent and severe Major

PAGE 12 - OPINION AND ORDER

Depressive Disorder and Alcohol Abuse.  Tr. 508.  He also noted that Plaintiff's chances for

successful treatment of her mood disorder were impaired by her continued use of alcohol and

inconsistent use of antidepressants.  Tr. 508.  Dr. Betlinski again evaluated Plaintiff on March 7,

2007, and again diagnosed a recurrent and severe Major Depressive Disorder and Alcohol

Dependence.  Tr. 510.  He noted a possible withdrawal from Cymbalta and Methadone.  Tr. 510.

The record indicates that Plaintiff underwent substance abuse treatment and therapy from

March 2007 through April 2008.  Tr. 511-34.  On April 28, 2008, Plaintiff reported overdosing

on Ambien because she was tired of the pain.  Tr. 534.  Dr. Betlinski noted Major Depressive

Disorder and Alcohol Abuse, with more anxiety than previous evaluations.  Tr. 534.

*C. The ALJ Hearing*

On April 9, 2007, ALJ Charles Evans held a hearing to address Plaintiff's, Plaintiff

testified that she recently began working as a part-time cashier at Target.  Tr. 548-49.  She

testified that she worked two to three days a week for approximately four to six hours a day.  Tr.

548-49.  She stated that she was unable to work more hours because of her fibromyalia,

degenerative disc disorder, carpal tunnel syndrome, and depression.  Tr. 549.  She further

testified that when she remained seated or standing in one place for one half-hour or more, she

developed a tingly feeling through her hands and feet, and a "sharp, constant  pain" through her

"whole body."  Tr. 549.  She estimated that during the four weeks she had been working, she had

missed one and a half days of work because of the pain.  Tr. 550.

Plaintiff further testified that she had worked as a part-time cashier at Target from

November 2004, through January 2005.  Tr. 554.  She also worked as a part-time cashier at a

supermarket and an art supply store during the period in question.  Tr. 554.  Plaintiff explained

PAGE 13 - OPINION AND ORDER

that she could not work full-time at these jobs because the she was unable to remain standing for the entire shift.  Tr. 554-55.  Plaintiff described "three or four incidents" where she had fallen down at work due to pain in her knees.  Tr. 554.

Plaintiff also testified that she was unable to sleep more than three or four hours at a time because of pain in her back, neck, and extremities.  Tr. 551-52.  Plaintiff testified that it "feels like somebody's got ahold of my neck and they're just squeezing as hard as they can."  Tr. 552.  She said that she takes pain and sleep medications, which help a little.  Tr. 551-52.  As a result of her inability to sleep, she often feels lethargic.  Tr. 552.  Plaintiff also testified that she has been to two different clinics to alleviate back pain, but that the cortisone injections did not relieve the pain.  Tr. 553.  She reported taking Lortab, a prescription narcotic, for back pain.  Tr. 552.

In response to the ALJ's questioning, Plaintiff stated that she was able to walk a quarter of a mile, and that she was able to stand for a half hour before having to sit down.  Tr. 555-56.  Plaintiff testified that she could lift less than five pounds occasionally, that she has difficulty doing things that require pushing or pulling, and that she has difficulty grasping onto things because of her carpal tunnel syndrome.  Tr. 556.  She stated that she can write with a pen or pencil for a short period of time, but that her fingers start to go numb "[a]fter awhile."  Tr. 556.  Plaintiff stated that she has "okay" eyesight and hearing, but that her memory and ability to concentrate are "not good." Tr.  557.  She stated that she experiences mental and physical fatigue every day.  Tr. 557-58.  She has difficulty climbing stairs, and is "rarely" able to drive or shop for her own groceries.  Tr. 557-58.  Plaintiff said she depends on family members and neighbors to help her with basic tasks, like shopping for groceries, cleaning, and walking her dog.  Tr. 557-59.

The Social Security Administration medical expert, Dr. David Rullman, M.D., testified at

PAGE 14 - OPINION AND ORDER

the ALJ hearing.  Tr. 559-562.  He testified that after reviewing Plaintiff's medical file, "we seem to be dealing with the problem of having discomfort in a variety of areas ongoing, use of many medications in an attempt to achieve relief, no secure diagnosis with the possible exception of fibromyalgia syndrome."  Tr. 561.  The medical expert noted that Plaintiff's lupus was "absolutely" not supported by the medical record, and that all tests for lupus came back normal. Tr. 561-62.  He also noted that despite her numerous visits to the emergency room in 2005 and 2006, there is no record that Plaintiff ever followed up with a primary care physician.  Tr. 561. Finally, the medical expert noted that although Plaintiff reported significant depression to a psychologist in 2004, the psychologist apparently disagreed with a diagnosis of depression because he made no diagnostic impression.  Tr. 561.

Gail Young, a vocational expert, also testified at the hearing.  Tr. 562-65.  Young classified Plaintiff's prior work as a receptionist and data entry as semiskilled and sedentary, while describing Plaintiff's work experience as a cashier and restaurant hostess as semiskilled and light work. Tr. 562-63.  Plaintiff's work as a baker's assistant is semiskilled, medium work. Tr. 563.  In light of Plaintiff's vocational history, her age, and education, the ALJ posed the following hypothetical to the vocational expert:

> Assume this individual could walk at one time on a level surface about a block, that she could stand for half an[] hour, she could sit at one time for an hour, pushing and pulling limited to light things like opening and closing drawers.  She can climb a dozen stair steps using a handrail.  She's right-handed.  She is impaired in the use of her fingers, but she can hold a pencil  and write.  Of course not for long periods of time, but she can write. . . . She can do the keyboard. . . . She does drive.  Her eyesight is functional.  She has a mild memory impairment for short, recent events.  That is short-term memory.  She has also a mild impairment in the ability to maintain concentration.  This would be due to body pain. . . . She takes pain medication and it would lower the level of alertness.  So let's say she's no more alert than say 90% of a lady her age who hadn't taken any

pain medication. . . . [T]he claimant does not sleep well and this augurs uncertain
fatigue.  So assume that she's . . . only 90% as good as a person who got sat a
normal night's sleep. . . . Could such an individual maintain employment in any of
the past relevant jobs the claimant has done?

Tr. 563-64.  The vocational expert responded, "I think the receptionist and data entry were both

sedentary in nature.  Which . . . would fit within the physical demands.  We're talking only about

mild impairments, functioning at 90%, which certainly would be reasonable for those

occupations."  Tr. 564.  The ALJ then asked, "[s]uppose you raise the impairment in

concentration to a moderate impairment?"  Tr. 564.  The vocational expert responded, "as I

understand the definition it does not preclude an individual from doing a task at the moderate

level."  Tr. 564.

Plaintiff's attorney also examined the vocational expert.  The attorney noted that Plaintiff

testified that she missed a day of work each week and asked whether that would "preclude all

employment?"  Tr. 565.  The vocational expert responded affirmatively.  Tr. 565.

### III. Legal Standards

SSI payments may be available to individuals who are age 65 or older, blind, or disabled,

but who do not have insured status under the Social Security Act.  42 U.S.C. § 1382(a).  When a

claimant seeks SSI payments based on disability, he or she bears the burden of proving disability.

Drouin v. Sullivan, 966 F.2d 1255, 1257 (9th Cir. 1992).  To meet this burden, the claimant must

demonstrate an inability to engage in any substantial gainful activity by reason of any medically

determinable physical or mental impairment which has lasted or can be expected to last for a

continuous period at least 12 months.  42 U.S.C. § 1382(a)(3)(A).  A claimant is disabled only if

her physical or mental impairments are of such severity that she is not only unable to do her

previous work, but cannot, considering her age, education, and work experience, engage in any

other kind of substantial gainful work in the national economy.  42 U.S.C. § 1382c(a)(3)(B);

Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir. 1999).

The Commissioner has established a five-step sequential evaluation process for

determining whether a claimant is disabled.  20 C.F.R. § 416.920; Quang Van Han v. Bowen,

882 F.2d 1453, 1456 (9th Cir. 1989).  First, the Commissioner determines whether the claimant

is engaged in "substantial gainful activity."  If the claimant is engaged in such activity, the

claimant is not disabled.  Otherwise, the Commissioner proceeds to step two and determines

whether the claimant has a medically severe impairment or combination of impairments.  A

severe impairment is one "which significantly limits [the claimant's] physical or mental ability to

do basic work activities."  20 C.F.R. § 416.920(c).  If the claimant does not have one or more

severe impairments, the claimant is not disabled.  If the impairment is severe, the Commissioner

proceeds to the third step to determine whether the impairment is equivalent to one of a number

of listed impairments that the Commissioner acknowledges are so severe as to preclude

substantial gainful activity.  20 C.F.R. § 416.920(d).  If the impairment "meets or equals" one of

those listed impairments, the claimant is conclusively presumed to be disabled.  If not, the

Commissioner proceeds to the fourth step to determine whether the impairment prevents the

claimant from performing work which the claimant performed in the past.  If so, the claimant is

not disabled and disability benefits are denied.  20 C.F.R. §  416.920(e).  If the claimant is unable

to perform work performed in the past, the Commissioner proceeds to the fifth and final step to

determine if the claimant can perform other work in the national economy in light of his or her

age, education, and work experience.  The claimant is entitled to disability benefits only if she is

not able to perform other work.  20 C.F.R. § 416.920(f).

At steps one through four, the burden of proof rests with the claimant.  At step five, the burden shifts to the Commissioner to show that the claimant can perform jobs that exist in significant numbers in the national economy.  Drouin, 966 F.2d at 1257.  The Commissioner may satisfy this burden through the testimony of a vocational expert, or by reference to the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appx. 2.  If the Commissioner demonstrates a significant number of jobs exist in the economy that the claimant can perform, the claimant is not disabled.  If the Commissioner does not meet this burden, the claimant is disabled.  20 C.F.R. § 416.920(f)(1).

Judicial review of the Commissioner's decision is guided by the same standards.  42 U.S.C. § 1383(c)(3).  This court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record as a whole.  42 U.S.C. § 405(g); Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995).  "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Andrews, 53 F.3d at 1039. The court must weigh all of the evidence, whether it supports or detracts from the Commissioner's decision.  Martinez v. Heckler, 807 F.2d 771, 772 (9th Cir. 1986).  The Commissioner's decision must be upheld if it is a rational interpretation of the evidence, even if  "the evidence is susceptible to more than one rational interpretation."  Andrews, 53 F.3d at 1039-40.  The reviewing court may not substitute its judgment for that of the Commissioner.  Robbins v. Soc. Sec. Admin., 466 F.3d 880, 882 (9th Cir. 2006).  Harmless errors do not change the outcome of a case and do not warrant reversal of the ALJ's decision.

Stout v. Comm'r Soc. Sec. Admin., 454 F.3d 1050, 1055 (9th Cir. 2006).

## IV. The ALJ's Findings

At step one of the disability evaluation, the ALJ found that Plaintiff had not engaged in substantial gainful activity since August 1, 2002, her alleged disability onset date. Tr. 22.

At step two, the ALJ determined that Plaintiff's disorders of the spine and depression are severe impairments. Tr. 23. The ALJ concluded, however, that Plaintiff's alleged right carpal tunnel syndrome, mild lupus with fibromyalgia, anxiety, and headaches are non-severe impairments. Tr. 23. The ALJ found that these impairments have not been conformed by medically acceptable diagnostic techniques, or have not lasted for a continuous period of twelve months or longer. Tr. 23. The ALJ also found that the record shows Plaintiff's lupus has been in remission. Tr. 23.

At step three, the ALJ found that Plaintiff did not have an impairment that met or equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, app. 1. Tr. 23. Regarding Plaintiff's physical impairments, the ALJ concluded, "the record shows no treating or examining physician has reported findings similar in severity to the description provided for any impairment" listed in Section 1.00 of Appendix 1, 20 C.F.R. Part 404, Subpart P. Tr. 23.

Although a non-examining medical source found that plaintiff did not have any medically determinable severe mental impairment, the ALJ gave Plaintiff the "benefit of the doubt, and [found] her mental impairment is severe." Tr. 23-24. The ALJ concluded, however, that Plaintiff's mental impairment resulted in only "mild" restrictions of daily living, "mild" difficulties in maintaining social functioning, "moderate" difficulties in maintaining concentration, and no episodes of decompensation. Tr. 24. The ALJ also found that the medical

evidence does not establish the presence of criteria for affective disorders.  Tr. 24.

The ALJ then determined that Plaintiff has the RFC to: walk one block at a time; stand 30 minutes at a time; sit one hour at a time; push and pull limited to light things like opening and closing drawers; and climb 12 stairs/steps with a handrail.  Tr. 24.  Although she is impaired in the use of her fingers, the ALJ found that she can write for short periods of time, she can do keyboarding, and is able to drive.  Tr. 24.  The ALJ noted that Plaintiff's eyesight and hearing are functional.  Tr. 24.  Plaintiff has a mild short-term memory impairment, and moderate impairment im maintaining concentration because of her pain, pain medication, and fatigue.  Tr. 24.

The ALJ found that Plaintiff's testimony concerning the intensity, persistence and limiting effects of her impairments not entirely credible because the objective medical evidence did not support her complaints. Tr. 25.  The ALJ noted that Plaintiff's complaints were undermined by her failure to follow medical advice to obtain additional epidural injections to alleviate neck and back pain.  Tr. 26-27.  In addition, the ALJ noted that Plaintiff had not been followed by a primary care physician and her treatment with a chiropractor was minimal and erratic.  Tr. 27.  The ALJ noted that Plaintiff had visited emergency rooms on multiple occasions seeking narcotic medications, and that physicians expressed concern about "drug seeking behavior." Tr. 27.  Finally, the ALJ noted that Plaintiff had other emergency room visits for drug and alcohol abuse.  Although Plaintiff was referred for drug and alcohol treatment, she refused this therapy.  Tr. 28.  For these reasons, the ALJ found her testimony not entirely credible. Tr. 28.

At step four, the ALJ relied on the testimony of the vocational expert and concluded that Plaintiff is capable of performing past relevant work as a receptionist and data entry clerk.  Tr.

29.  According, the ALJ concluded that Plaintiff has not been under a disability since July 30,

2003, the date the application was filed.  Tr. 29.

## V. Discussion

Plaintiff contends the Commissioner's final decision denying her claim for SSI payments

should be reversed because the ALJ: (1) failed to consider or discuss evidence related to

Plaintiff's obesity and thus, failed to find that Plaintiff's obesity was a severe impairment; (2)

failed to consider Plaintiff's obesity in combination with her other impairments; (3) improperly

found Plaintiff's testimony not entirely credible; and (4) improperly assessed Plaintiff's residual

functional capacity.  I disagree.

*A. The ALJ Adequately Considered Plaintiff's Obesity*

Plaintiff first argues that the ALJ erred by omitting any discussion of her obesity, and

failing to find that Plaintiff's obesity was a severe impairment.  The key consideration in

evaluating obesity, however, is not its extent but its effect on the claimant's level of functioning.

SSR 02-01p, available at 2007 WL 628049, at *2, 5-8; Burch v. Barnhart, 400 F.3d 676, 682-84.

The Social Security Rules provide that obesity, as other medical impairments, will be deemed a

significant impairment "when alone or in combination with another medically determinable

physical or mental impairment(s), it significantly limits an individual's physical or mental ability

to do basic work activities." SSR 02-01p, available at 2007 WL 628049, at *4; Burch, 400 F.3d

at 682.

Here, there is no evidence in the record that Plaintiff's obesity limited her functioning in

any way.  There is no formal diagnosis of obesity, and the medical record is silent as to how

Plaintiff's obesity might have exacerbated any condition.  Plaintiff did not present any testimony

or other evidence that her obesity impaired her ability to work.  Even on appeal, Plaintiff has

failed to point to any evidence in the record of functional limitations due to obesity. In fact,

Plaintiff cites only two notes in the record related to her obesity—a note from a psychological

consultant, and a notation on a social work report for hospital admission—that state simply that

Plaintiff is "obese."  Tr. 304, 446.  Plaintiff also argues that based on her Body Mass Index

("BMI"), her obesity is a severe impairment.  Both of these arguments are unpersuasive.  The

Social Security Rules make clear that there is "no specific level of weight or BMI that equates"

with a severe impairment.  SSR 02-01p, available at 2007 WL 628049, at *4.  "[N]either do

descriptive terms" establish whether obesity is severe for disability purposes.  Id. Rather, the ALJ

will do "an individualized assessment of the impact of obesity on an individual's functioning

when deciding whether the impairment is severe." Id.  Because there is no evidence in the record

of any functional limitations due to obesity, I find that the ALJ did not commit reversible error by

failing to discuss Plaintiff's obesity.

> B. Plaintiff Failed to Meet Her Burden of Proving that Obesity Combined with Other
>
> Impairments Met or Equaled the Requirements of Any Listed Impairment

Plaintiff also argues that the ALJ failed to consider the impacts of her obesity in

combination with other impairments.  Pl.'s Brief, at 6-10.  Plaintiff contends that she "met the

listed impairment for depression based on the combination of obesity, depression, and back

pain." Id. at 6.

At step three of the sequential analysis, the ALJ must determine whether the claimant's

impairments meet or equal any of the listed impairments considered so severe as to automatically

constitute disability.  20 C.F.R. §§ 404.1594(c)(3), 404.1520(d); Tackett, 180 F.3d at 1098.  "If a

claimant has more than one impairment, the ALJ must determine 'whether the combination of [the] impairments is medically equal to any listed impairment.'" Lewis v. Apfel, 236 F.3d 503, 514 (9th Cir. 2001) (quoting 20 C.F.R. § 404.1526(a)).   "Equivalence may be determined if a claimant has multiple impairments, including obesity, none of which meets the listing requirement, but which when viewed in the aggregate are equivalent to a listed impairment." Burch, 400 F.3d at 682 (citing SSR 02-01p).  The ALJ is not required, however, to discuss the "combined effects of a claimant's impairments or compare them to any listing in an equivalency determination, unless the claimant presents evidence in an effort to establish equivalence." Burch, 400 F.3d at 683.  The Social Security Rules explain that an ALJ:

> will not make assumptions about the severity or functional effects of obesity combined with other impairments.  Obesity in combination with another impairment may or may not increase the severity or functional limitations of the other impairment.  [The ALJ] will evaluate each case based on the information in the case record.

SSR 02-01p, available at 2000 WL 628049, at *6.  It is plaintiff's burden to offer a theory as to how his impairments combine to equal the criteria for listed impairment.  Burch, 400 F.3d at 683. A finding of equivalence must be based on medical evidence, and not on a generalized assertion of functional problems.  Tackett, 180 F.3d at 1100.

Here, Plaintiff failed to establish equivalence.  The ALJ provided a thorough discussion of the medical evidence and Plaintiff's impairments.  Tr. 23-29.  As noted, there was no evidence before the ALJ, and none in the record, which shows that obesity exacerbates any of  Plaintiff's functional limitations.  Plaintiff points to no evidence showing that obesity in combination with her other impairments meets or equals the listing criteria for depression.  Moreover, there is no evidence Plaintiff's obesity impairs her ability to work.  Because Plaintiff failed to offer a

plausible theory as to how an obesity in combination with her other impairments equals the listing criteria for depression, the ALJ was not required to engage in an extensive discussion of equivalency. Lewis, 236 F.3d at 514. Based on this record, I find that the ALJ did not commit reversible error by failing to discuss whether Plaintiff's obesity combined with another impairment to establish equivalence of a listed impairment.

*C. The ALJ Provided Clear and Convincing Reasons Supported by Substantial Evidence for Discrediting Plaintiff's Testimony*

The ALJ found that Plaintiff's testimony concerning the intensity, persistence and limiting effects of her impairments not entirely credible. Plaintiff contends that the ALJ failed to provide legally adequate reasons for rejecting her testimony.

The Ninth Circuit has established a two-part test in evaluating a claimant's subjective symptom testimony. The claimant must (1) produce objective medical evidence of one or more impairments, and (2) show that the impairment or combination of impairments could reasonably be expected to produce some degree of symptom. Smolen v. Chater, 80 F.3d 1273, 1281-82 (9th Cir. 1996). The claimant need not produce objective medical evidence of the symptoms, their severity, or the causal relationship between the medically determinable impairment and the symptom. Id. The ALJ is not, however, required to automatically credit or believe every allegation of disabling pain. Fair v. Bowen, 885 F.2d 597, 603 (9th Cir. 1989). Such a rule would essentially make disability benefits available on demand. Id.

The ALJ is responsible for evaluating the credibility of the claimant's testimony. Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989) (citations omitted). In assessing a claimant's credibility, the ALJ may rely on: (1) ordinary techniques of credibility evaluation,

PAGE 24 - OPINION AND ORDER

such as the claimant's reputation for lying, prior inconsistent statements concerning the

symptoms, and other testimony by the claimant that appears less than candid; (2) an unexplained

or inadequately explained failure to seek treatment or follow a prescribed course of treatment;

and (3) the claimant's daily activities.  Smolen, 80 F.3d at 1284 (citations omitted).  If there is no

affirmative evidence of malingering, the ALJ must provide "clear and convincing" reasons for

rejecting the claimant's testimony regarding the severity of her symptoms.  Dodrill v. Shalala,

12 F.3d 915, 918 (9th Cir. 1993).  The ALJ must provide "specific, cogent reasons for the

disbelief" and "identify what testimony is not credible and what evidence undermines the

claimant's complaints." Lester v. Chater, 81 F.3d 821, 834 (9th Cir. 1995) (citations omitted);

see also Oteza v. Shalala, 50 F.3d 748, 750 (9th Cir. 1995) (The ALJ's credibility findings must

be "sufficiently specific to permit the reviewing court to conclude that the ALJ did not arbitrarily

discredit the claimant's testimony.").  Where the ALJ makes specific findings justifying a

decision to disbelieve an allegation and those findings are supported by substantial evidence in

the record, the court may not second-guess that decision.  Fair, 885 F.2d at 603.

In this case, Plaintiff provided objective medical evidence of an impairment and there is

no affirmative evidence of malingering.  Thus, the issue is whether the ALJ provided clear and

convincing reasons for discounting Plaintiff's testimony regarding the effect of her impairments

on her ability to work.  I find that he did.

In evaluating Plaintiff's credibility, the ALJ found that Plaintiff's complaints were

inconsistent with the objective medical evidence, and the record as a whole.  Tr. 25-29.

Although the ALJ's credibility determination may not be based solely on the lack of objective

medical evidence, the ALJ may disbelieve a claimant's testimony when the claimant submits

PAGE 25 - OPINION AND ORDER

medical evidence of an underlying impairment but testifies that he or she experiences pain or symptoms at a higher level.  Tonapetyan v. Halter, 242 F.3d 1144, 1147-48 (9th Cir. 2001); Nyman v. Heckler, 779 F.2d 528, 531 (9th Cir. 1985).

Here, the ALJ concluded that while Plaintiff's impairments could be expected to produce some of the alleged symptoms, the objective medical evidence did not support her statements regarding intensity, persistence, and limiting effects of those symptoms.  Tr. 23-29. The ALJ noted that on November 21, 2004, Plaintiff's x-rays of the lumbar spine were normal.  Tr. 25, 260.  Plaintiff's January 7, 2003 x-rays of the cervical spine and right wrist were also normal.  Tr. 25, 257-58.  Another lumbar spine x-ray in February 2003 was normal.  Tr. 254.  In January 2003, Dr. David Crutchfield, M.D., noted that Plaintiff had normal motor function, strength, good grip strength, capillary refill, and pulses.  Tr. 25, 249.  A March 2003 x-ray of the lumbar spine was normal, and Dr. Godwin Maduka, M.D., noted no sensory or motor deficit in upper or lower extremities.  Tr. 25, 182.  An MRI  revealed only mild changes of osteoarthritis, ligamentum flavum hypertrophy without significant canal stenosis, and no disc pathology identified.  Tr. 25, 255.

In March 2003, x-rays of the thoracic and cervical spine showed mild degenerative disc disease and a slight straightening of the cervical curvature, but were otherwise unremarkable.  Tr. 26, 185-87.  A March 2003 lumber spine x-ray showed no evidence of acute traumatic injury or significant degenerative disc disease.  Tr. 26, 185.  In August 2003, another x-ray of Plaintiff's thoracic spine and pelvis was normal.  Tr. 26, 252.

The ALJ noted that a December 2003 MRI of Plaintiff's cervical spine showed "minimal central stenosis at C3-4, C4-5, and C5-6."  Tr. 26, 300.  An MRI of the lumbar spine on the same

date revealed "very early degenerative changes at L4-5 and minimal foraminal stenosis at L4-5

on the left, and s "[m]ild to moderate-sized disc extrusion at L5-S1, left paracentrally, possibly

affecting the left S1 nerve root."  Tr. 26, 299.  The ALJ noted, however, that the radiologist

believed these findings were of questionable acute significance, and that the nerve root canals

were not narrowed.  Tr. 26, 300.  The MRI was otherwise unremarkable.  The ALJ also noted

January and May 2003 CT scans of the brain were normal.  Tr. 26, 256.

With respect to Plaintiff's depression, the ALJ noted that Dr. Joe Wood, Psy.D., found

that Plaintiff's presentation and level of functioning were inconsistent with her complaints of

depression.  Tr. 26, 303-06.  Dr. Wood declined to assess any mental diagnoses.  Tr. 26, 306.

The ALJ also noted that the Disability Determination Services physician found that Plaintiff did

not have a medically determinable severe mental impairment.  Tr. 23, 314.

I find that the inconsistencies between Plaintiff's subjective complaints and the objective

medical evidence in the record constitute specific and substantial reasons that undermine

Plaintiff's credibility.  Morgan v. Comm'r of Soc. Sec. Admin., 169 F.3d 595, 600 (9th Cir.

1999).  The ALJ's detailed analysis of the discrepancy between Plaintiff's complaints and the

objective evidence is supported by substantial evidence in the record.

The ALJ also discounted Plaintiff's credibility based upon unexplained or inadequately

explained failure to seek treatment, or to follow prescribed courses of treatment.  Tr. 26-29.  The

ALJ noted that although Dr. Maduka had recommended additional epidural injections for her

back pain, there was no evidence that Plaintiff followed that advice.  Tr. 27, 171.  The ALJ also

noted that Plaintiff failed to follow the advice of several emergency room doctors and social

workers, who all recommended that she visit her therapist, primary care physician, or attend

PAGE 27 - OPINION AND ORDER

alcohol and drug treatment for mental health issues.  Tr. 28, 333, 359, 374, 380, 407, 413, 426,

436, 442.  Finally, the ALJ noted that the record of Plaintiff's treatment with a chiropractor was

minimal and erratic.  Tr. 27.  The ALJ is permitted to consider lack of treatment, or inadequately

explained failure to follow a prescribed course of treatment in assessing credibility.  Smolen, 80

F.3d at 1284; Burch; 400 F.3d at 680-81.

 In finding Plaintiff's testimony not entirely credible, the ALJ also noted inconsistencies

between Plaintiff's activities like going dancing and her claims of disability. Tr. 27; 344.  While

Plaintiff's ability to go dancing does not necessarily indicate that she is able to work, it is

inconsistent with her alleged level of impairment and allows the ALJ to draw an adverse

inference as to her credibility.  Thomas, 278 F.3d at 958-59.  The ALJ also noted that Plaintiff

visited the emergency room on July 11, 2005, complaining of radiating back pain, but that the

examining physician saw Plaintiff "pick up a chair and move it into the room of a companion . . .

without any evidence of back pain or discomfort at all."  Tr. 27, 413.  Further, the ALJ noted that

Plaintiff's employment as a cashier during the period in question undermined her alleged

inability to work.  I find that the inconsistencies between Plaintiff's alleged impairments and her

activities of daily living are specific, cogent reasons for discrediting her testimony.  Burch, 400

F.3d at 680-81; Lester v. Chater, 81 F.3d 821, 834 (9th Cir. 1995).

 Finally, the ALJ noted the extensive evidence of Plaintiff's drug-seeking behavior in

finding her testimony not entirely credible.  Tr. 26-29, 344, 358-59, 374, 393, 406, 413, 435.

Plaintiff's numerous attempts to obtain narcotics through emergency room visits are relevant to

her motivation and the issue of secondary gain, which are both appropriate factors to consider in

assessing a claimant's credibility. Gallant v. Heckler, 753 F.2d 1450, 1458-59 (9th Cir. 1984)

(motivation and secondary gain are relevant to credibility analysis).

On this record, I find that the ALJ provided clear and convincing reasons for discounting Plaintiff's subjective complaints. Those reasons are supported by substantial evidence in the record, and are a fair reading of the record. Accordingly, the ALJ did not err in finding Plaintiff not entirely credible.

### D. The ALJ's Residual Functioning Capacity Finding Properly Summarized Plaintiff's Functional Limitations and Ability to Work

The ALJ assessed Plaintiff with a RFC to perform work at the sedentary exertional level with the following limitations: she is able to walk one block at a time; stand thirty minutes at a time; sit one hour at a time; push and pull limited to light things like opening and closing drawers; and climb 12 stairs/steps with a handrail. Tr. 24. Although she is impaired in the use of her fingers, the ALJ found that she can write for short periods of time, she can do keyboarding, and is able to drive. Tr. 24. The ALJ noted that Plaintiff's eyesight and hearing are functional. Tr. 24. Plaintiff has a mild short-term memory impairment, and moderate impairment im maintaining concentration because of her pain, pain medication, and fatigue. Tr. 24. Based on these findings, the ALJ concluded Plaintiff was able to perform past relevant work as a receptionist and data entry clerk as actually and generally performed. Tr. 29. Plaintiff argues the ALJ's RFC assessment did not assess her ability to work on a regular and continuing basis.

Generally, RFC is "an assessment of an individual's ability to do sustained work-related physical and mental activities in an ordinary work setting on a regular and continuing basis." SSR 96-8p, available at 1996 WL 374184, at *1. A "regular and continuing basis" means 8 hours a day, for 5 days a week, or an equivalent work schedule. Id. The RFC assessment

considers only functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments.  Id.  The initial burden of proving the functional limitations that make up the RFC is on the claimant.  Roberts v. Shalala, 66 F.3d 179, 182 (9th Cir. 1995).

The ALJ first identifies the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis.  SSR 96-8p, available at 1996 WL 374184, at *1.  After that, RFC be expressed in terms of the exertional levels of work, sedentary, light, medium, heavy, and very heavy.  Id. RFC is not the least an individual can do despite his or her limitations or restrictions, but the most.  Id.  In assessing the claimant's RFC, the ALJ must consider the whole record and include a discussion of the individual's abilities on that basis.  Id. at *5.

On this record, I find that the ALJ properly accounted for all of Plaintiff's credible mental and physical limitations.  The ALJ's decision contains a thorough discussion and analysis of the objective medical evidence, resolves inconsistencies in the record as a whole, and sets forth a logical explanation of the effects of Plaintiff's symptoms on her ability to work.  See SSR 96-8p, available at 1996 WL 374184, at *7.  I am not persuaded by Plaintiff's contention that the ALJ "left out a finding of physical and mental abilities for 8 hours a day five days a week."  Pl.'s Brief, at 15.  In assessing a claimant's RFC, the ALJ is not required to invoke a specific magic phrase, such as "8 hours a day five days a week."  Cf. Magallanes, 881 F.2d at 755 (The ALJ is not required to "recite" any magic words to reject a medical opinion; the reviewing court may make specific and legitimate inferences from the ALJ's detailed summary of the evidence).  The concept of RFC requires work on a regular and continuing basis and therefore, the court may

PAGE 30 - OPINION AND ORDER

make the reasonable inference that the ALJ's RFC assessment accounted for such regular work.

Id.; see also Finazzo v. Astrue, No. C08-806-CRD, 2009 WL 279033, at *6 (W.D. Wash. Feb. 5,

2009) ("It is axiomatic that the RFC determination is inherently an assessment of a claimant's

ability to perform ongoing work.").  Although the medical evidence in this case indicated that

Plaintiff was limited to light exertion work, the ALJ was even more generous in his assessment

in finding her limited to sedentary work, and able to perform past relevant work as a receptionist

and data entry clerk.  Tr. 28.

The ALJ's RFC finding reflected a proper clarification of Plaintiff's limitations and

ability to do work on a regular basis.  That finding was based on substantial evidence in the

record.  Accordingly, I find no error.

## VI. Conclusion

For these reasons, the Court AFFIRMS the decision of the Commissioner and

DISMISSES this action.

IT IS SO ORDERED.

Dated this _____23rd_____ day of July, 2010.


____/s/ Garr M. King_____
Garr M. King
United States District Judge


PAGE 31 - OPINION AND ORDER